UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DANIEL ALLEN,

Plaintiff,

v.                                                    CAUSE NO. 3:23-CV-47-JD

WEXFORD OF INDIANA LLC, et al.,

Defendants.

OPINION AND ORDER

Daniel Allen, a prisoner without a lawyer, is proceeding in this case on three

claims. First, he is proceeding against Case Worker Ryan Carter, Correctional Sergeant

Trevor Heishman, Case Worker Steven Price (collectively, the "state defendants"), and

John Doe #4 "in their individual capacities for compensatory and punitive damages for

deliberate indifference to his safety in May 2021, resulting in attacks by other inmates

on May 28, 2021, in violation of the Eighth Amendment[.]" ECF 9 at 8; ECF 97 at 2.

Second, he is proceeding against Nurse James Cattin, Nurse Kimberly Myers, Nurse

Pamela Cool, and Dr. Noe Marandet (the "medical defendants") "in their individual

capacities for compensatory and punitive damages for deliberate indifference to his

serious physical injuries following an attack by another inmate, in violation of the

Eighth Amendment[.]" *Id.* Third, he is proceeding "against Wexford of Indiana, LLC,

for compensatory and punitive damages for having a policy of encouraging its staff to

deny necessary but costly medical care at the end of its contract with the IDOC,

resulting in delayed emergency medical treatment for the serious physical injuries Allen

sustained following an attack by another inmate, in violation of the Eighth Amendment[.]" ECF 9 at 9. The state defendants filed a motion for summary judgment which is now fully briefed. ECF 119, 133, 135. The medical defendants and Wexford also filed a joint motion for summary judgment which is likewise fully briefed. ECF 123, 132, 134.[1] Both summary judgment motions are now ripe for ruling.

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable [factfinder] could [find] for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). A party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading but must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

---

[1] In their reply, the medical defendants and Wexford "object" to Allen's statement of material facts in his summary judgment response, arguing his statement of material facts is improper because he mixes arguments into his facts. ECF 134. Allen submits a letter in response, stating he has a learning disability, did the best he could in responding to the summary judgment motion, does not understand what is wrong with his statement of material facts, and that he hopes his improper response does not hurt him in this case. ECF 139. Allen did an adequate job responding to the summary judgment motions, and the court can differentiate between the facts Allen states and the arguments he raises in his statement of material facts. The defendants' objection to Allen's statement of material facts is therefore denied.

## I.    State defendants

Allen is proceeding against the state defendants for violating his Eighth Amendment rights by being deliberately indifferent to his safety in May 2021, resulting in attacks by other inmates on May 28, 2021. ECF 9 at 8.

The Eighth Amendment imposes a duty on prison officials "to take reasonable measures to guarantee the safety of inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "[I]n order to state a section 1983 claim against prison officials for failure to protect, [a plaintiff] must establish: (1) that he was incarcerated under conditions posing a substantial risk of serious harm and (2) that the defendants acted with deliberate indifference to his health or safety." *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010) (quotation marks omitted). In the context of failure to protect cases, the Seventh Circuit has equated "substantial risk" to "risks so great that they are almost certain to materialize if nothing is done." *Brown v. Budz*, 398 F.3d 904, 911 (7th Cir. 2005). In such cases, "a prisoner normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety." *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996). Regarding the second prong, deliberate indifference occupies a space slightly below intent and poses a 'high hurdle and an exacting standard' requiring 'something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Stockton v. Milwaukee Cty.*, 44 F.4th 605, 615 (7th Cir. 2022) (quoting *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020)); *see also Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (stating that deliberate-indifference claims will fail absent evidence of "callous disregard" for inmate wellbeing). To prevail,

the plaintiff must establish that the defendant "had actual knowledge of an impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *Santiago*, 599 F.3d at 756.

The parties provide evidence showing the following facts: On April 9, 2021, while Allen was housed in the K Housing Unit ("KHU"), he was involved in a fight with his cellmate Eric Humphreys. ECF 119-3. Allen was deemed to be the "aggressor" and was transferred to the Adjustment Housing Unit ("AHU"). ECF 93-3 at 2. AHU is the most secure dorm available at Miami Correctional Facility ("MCF"), and inmates who believe they are in danger can request they be moved to AHU. ECF 119-1 at 2.

On April 11, 2021, while Allen still was housed in AHU, he informed his mental health specialist that he feared for his safety if he was returned to general population because Humphreys was a gang member who "has guys everywhere" in the prison. ECF 133-2 at 3, 14. The mental health specialist recorded that Allen "does not want to go back to population because he 'knows that [Humphreys] has guys everywhere.'" *Id.* The mental health specialist advised Allen to submit a Request for Interview form regarding this situation. *Id.* Allen submitted a Request for Interview form requesting that he be allowed to stay in AHU, but never received any response. *Id.* at 3; ECF 133-1 at 3. On April 30, 2021, Allen was moved to P Housing Unit ("PHU"), which is less restrictive than AHU but more restrictive than general population. *Id.*; ECF 93-3 at 8; ECF 119-4.

Allen began writing letters to his aunt stating he feared for his life if he was moved back into general population. ECF 133-2 at 22-29. On May 11, 2021, a non-party

4

member of prison staff flagged a message Allen sent to his aunt in which he expressed fear regarding a potential move back to KHU. ECF 93-4 at 14. Allen stated he was in fear for his life because his former cellmate Humphreys was located in KHU and was in a "gang of some kind." *Id.* In response, Allen was scheduled to meet with Case Worker Price. *Id.* at 13.

On May 12, 2021, Allen spoke with Case Worker Price, relayed his concerns about being moved back into general population, and requested that he be placed into protective custody. ECF 93-4 at 12; ECF 133-2 at 6. The parties disagree over what was said during this conversation. Case Worker Price documented that Allen had "concerns about going back down to KHU ¾ side" but would be better off on "KHU ½." ECF 93-4 at 12. Alternatively, Allen attests his conversation with Case Worker Price "didn't change" from the conversation he had with his mental health specialist, in which he stated he did not want to go back into general population because Humphreys "has guys everywhere" in the prison. ECF 133-2 at 3, 6; ECF 133-1 at 4. According to Allen, Case Worker Price stated MCF does not have a protective custody unit and told him he was "going to have to deal with whatever [he] had going on." ECF 133-2 at 6. Allen then asked Caseworker Price for a grievance form and requested to talk to his supervisor about the issue, but Case Worker Price refused to provide the form and threatened that if Allen continued to "push it" he would be housed with someone in Humphrey's gang as punishment. *Id.*

On May 17, 2021, Allen was moved to the L Housing Unit ("LHU"), a general population dorm. ECF 93-3 at 8. He was placed into a cell with Kenneth Braswell, who

5

Allen claims is a member of the same gang as Humphreys. ECF 133-2 at 7; ECF 107 at 72.[2] Allen had received threats from that gang in relation to his prior incident with Humphreys, but he did not believe Braswell knew who he was when they first became cellmates. ECF 107 at 72-73. At some point after Allen arrived in LHU, he spoke with Case Worker Carter in the dayroom and informed him that he feared for his safety because he had a prior incident with Humphreys, he had received threats from Humphreys gang, and his current cellmate Braswell was affiliated with Humphrey's gang. ECF 133-2 at 7; ECF 107 at 73-74. In response, Case Worker Carter told Allen "you better learn to fight." *Id.* Allen told Case Worker Carter he was requesting protective custody and asked if he could be moved into segregation for his safety, and Case Worker Carter stated he did not have time to address his concerns because his shift was almost over. *Id.*

On the morning of May 28, 2021, Allen was assaulted by Braswell and three or four other gang members in his cell. ECF 133-2 at 8. According to Allen, Braswell and the other gang members found out who he was, came into his cell, and "beat the tar" out of him. *Id.*; ECF 107 at 72. Following this assault, Allen went to the shower to wash the blood off. ECF 133-2 at 8. While Allen was in the shower, Sgt. Heishman observed Braswell acting suspicious around the showers and searched him. *Id.*; ECF 93-3 at 5. Sgt. Heishman found three weapons on Braswell's person, including two sharpened pieces of metal and an impact weapon made from a square metal piece from a fan. ECF 93-3 at

---

[2] According to the prison's records, Braswell is a documented member of the "Imperial Gangsters." ECF 119-2.

5. Sgt. Heishman recovered each of these weapons. *Id.* Approximately half an hour later, Sgt. Heishman observed Braswell attacking Allen with his fists in the dayroom. *Id.* at 1, 5. Sgt. Heishman realized Allen had also been attacked with a weapon due to his body language and the sign of blood coming from his shoulder. *Id.* at 5. Sgt. Heishman ordered Braswell and Allen to lay on the ground, not knowing where the weapon was. *Id.* Both inmates complied and were restrained without incident. *Id.* The weapon, a six-inch long piece of sharpened metal, was found, Allen was transported to the medical unit and treated for multiple stab wounds, and Braswell was escorted to a holding cell pending a bed move. *Id.* Allen was admitted to the infirmary and later transferred to a different prison facility once he recovered. *Id.* at 2, 8.

Here, crediting Allen's version of events, a reasonable jury could conclude that both Case Worker Price and Case Worker Carter were deliberately indifferent to Allen's safety, but there is insufficient evidence by which a reasonable jury could conclude Sgt. Heishman was deliberately indifferent to Allen's safety. Each defendant will be addressed in turn.

### *Case Worker Price*

Regarding Case Worker Price, Allen attests that: (1) he told Case Worker Price on May 12 that he feared for his safety and did not want to go back to general population because of the incident with Humphreys and because Humphreys "has guys everywhere" in the prison; (2) Case Worker Price responded that Allen was "going to have to deal with whatever [he] had going on;" and (3) Allen then requested a grievance form and to speak to Case Worker Price's supervisor, and Case Worker Price

refused to provide any forms and stated that if Allen continued to "push it" he would house him with a member of Humphrey's gang as punishment. ECF 133-2 at 3, 6. Allen was then transferred to the LHU where he was housed with a member of Humphrey's gang and subsequently attacked and stabbed numerous times. *Id.* at 7-8. If a reasonable jury were to credit Allen's version of events, it could conclude that he informed Case Worker Price of a specific threat to his safety and Case Worker Price exhibited "a total unconcern" for his safety by taking no steps to prevent him from being housed with a member of Humphrey's gang. Case Worker Price argues Allen only informed him that he had concerns of living on the "¾ side" of KHU, and he reasonably responded to these concerns by moving him to the LHU rather than the KHU. But this asks the court to construe the facts in the light most favorable to Case Worker Price, as it conflicts with Allen's testimony that he informed Case Worker Price he feared to go back to general population because Humphreys "has guys everywhere" in the prison. *See id.* at 3, 6. Moreover, a reasonable jury could conclude that, even if Case Worker Price acted reasonably by placing Allen in the LHU rather than the KHU, Case Worker Price should have also taken some steps to prevent Allen from being housed with a member of Humphrey's gang in the LHU. Because a reasonable jury could credit Allen's version of events and conclude Case Worker Price was deliberately indifferent to his welfare in the face of serious risks, summary judgment is not warranted in favor of Case Worker Price.

### *Case Worker Carter*

Regarding Case Worker Carter, Allen attests that: (1) he spoke with Case Worker Carter in the dayroom once he was moved to the LHU; (2) he informed Case Worker

Carter of his situation and that he feared for his safety because was being housed with a member of a gang that was threatening him; and (3) Case Worker Carter responded that he "better learn to fight" and that he did not have time to address his concerns because his shift was ending. ECF 133-2 at 7. A reasonable jury could credit Allen's version of events and conclude he informed Case Worker Carter of a specific threat to his safety and Case Worker Carter exhibited "a total unconcern" for his safety by taking no steps to help him. Case Worker Carter argues he did not know Allen faced a "substantial risk" of harm because Allen was housed with Braswell for approximately eleven days before Braswell assaulted him, which shows Allen was not in "immediate danger" from being housed with Braswell. ECF 120 at 12-13. But this is consistent with Allen's testimony that Braswell did not seem to know who he was when they first became cellmates and assaulted him as soon as he realized his identity. ECF 107 at 72-73. By telling Case Worker Carter that he was being housed with a member of a gang that was threatening him, a reasonable jury could conclude Allen informed Case Worker Carter about a "specific threat to his safety" and that Case Worker Carter had "actual knowledge of impending harm" to Allen. *See Pope*, 86 F.3d at 92. And by doing nothing to protect Allen from his cellmate, a reasonable jury could conclude Case Worker Carter acted with a "conscious, culpable refusal to prevent" that harm. *See Santiago*, 599 F.3d at 756. Therefore, summary judgment is not warranted in favor of Case Worker Carter.

### *Sgt. Heishman*

Regarding Sgt. Heishman, there is no evidence he was ever aware of a specific threat to Allen's safety prior to witnessing the second assault. Crediting Allen's version

9

of events, Allen was first assaulted by Braswell and other gang members in his cell on the morning of May 28. ECF 133-2 at 8. There is no evidence Sgt. Heishman witnessed or was otherwise made aware of this initial assault. Following this initial assault, Sgt. Heishman observed Braswell acting suspiciously by the showers, searched him, and confiscated three weapons. ECF 93-3 at 5. Allen argues Sgt. Heishman should have taken action against Braswell at this point and removed him from the cellhouse. Maybe so, but the evidence shows only that Sgt. Heishman knew Braswell possessed three weapons which he confiscated. There is no evidence Sgt. Heishman knew Braswell had any issue with Allen, that he had assaulted Allen earlier that morning, that he intended to use those weapons against Allen, or that he had access to any other weapons. Sgt. Heishman later observed Braswell attacking Allen in the dayroom, and acted promptly to break up the assault and protect Allen. Because there is no evidence Sgt. Heishman knew Braswell had threatened or attacked Allen at any point before he observed Braswell attacking Allen in the dayroom, no reasonable jury could conclude Sgt. Heishman knew Braswell posed a "substantial risk of serious harm" to Allen and was deliberately indifferent to that risk. Summary judgment is therefore warranted in favor of Sgt. Heishman on this claim.

John Doe #4

Allen alleged in his complaint that John Doe #4 was deliberately indifferent for the same reasons as Sgt. Heishman. ECF 9 at 2-3. Specifically, he alleged John Doe #4 participated in searching Braswell in the shower and confiscating his weapons, and was deliberately indifferent for failing to remove Braswell from the cellhouse after

confiscating his weapons. ECF 1 at 7-8. Therefore, while John Doe #4 has not yet been identified or served in this case and has not moved for summary judgment, the undisputed facts show John Doe #4 is entitled to summary judgment for the same reasons as Sgt. Heishman. Pursuant to Fed. R. Civ. P. 56(f), the court can grant summary judgment for a nonmovant only after giving notice and a reasonable time to respond. The court therefore gives Allen notice it will enter summary judgment in favor of John Doe #4 unless he files a motion on or before March 31, 2026, showing good cause for why judgment should not be entered.

## II.    Medical defendants

Allen is proceeding against the medical defendants for violating his Eighth Amendment rights by being deliberately indifferent to his serious physical injuries following the May 28 assault. ECF 9 at 8. He is also proceeding against Wexford for violating his Eighth Amendment rights by "having a policy of encouraging its staff to deny necessary but costly medical care at the end of its contract with the IDOC, resulting in delayed emergency medical treatment for the serious physical injuries Allen sustained" following the May 28 assault. *Id.* at 9.

Under the Eighth Amendment, inmates are entitled to adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish liability under the Eighth Amendment, a prisoner must show: (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to his medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). For a medical professional to be held liable for deliberate indifference to an inmate's medical needs, she must make a decision that

11

represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). As the Seventh Circuit has explained:

> [M]edical professionals are not required to provide proper medical treatment to prisoners, but rather they must provide medical treatment that reflects professional judgment, practice, or standards. There is not one proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field. A medical professional's treatment decisions will be accorded deference unless no minimally competent professional would have so responded under those circumstances.

*Id.* at 697-698. Negligence, incompetence, or even medical malpractice do not amount to deliberate indifference. *Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004).

Furthermore, a prisoner is not entitled to demand specific care, nor is he entitled to the "best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Where the defendant has provided some level of care for a prisoner's medical condition, in order to establish deliberate indifference the prisoner must show that "the defendants' responses to [his condition] were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). A mere disagreement with medical professionals about the appropriate treatment does not amount to an Eighth Amendment violation. *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003).

The medical defendants provide affidavits and Allen's medical records, which show the following facts: On May 28, 2021, Nurse Cattin saw Allen in the infirmary

following the assault. ECF 124-2 at 1-2; ECF 124-8 at 1-3. Allen reported he had been stabbed numerous times, and Nurse Cattin performed a detailed assessment and found Allen had a puncture wound to his left shoulder, right shoulder, left upper abdomen, a laceration above his right eye, and a laceration to the left side of his head. *Id.* Nurse Cattin assessed Allen's vital signs and noted his O2 saturation was 95% with normal lung sounds. *Id.* Allen reported discomfort with deep inhalation, which was consistent with a puncture wound to his chest. *Id.* All of Allen's wounds were cleaned, the bleeding stopped, the wounds were bandaged, and Allen was kept in the infirmary for monitoring. *Id.* Nurse Cattin noted Allen had clear injuries and reported pain, but did not believe there was any indication of a clear and obvious emergency requiring a transfer to the emergency room as Allen's condition was stable, his vital signs were normal, and the bleeding had stopped. *Id.*

Approximately two hours later, Allen was seen in the infirmary by Nurse Myers. ECF 124-3 at 1-2; ECF 124-8 at 10-12. Nurse Myers provided Allen a Toradol injection for the pain and offered him sutures for the laceration above his right eyebrow which he refused. *Id.* An examination found Allen's vital signs were normal, including his O2 saturation level, blood pressure, and pulse. *Id.* Nurse Myers ordered that Allen be admitted to the infirmary, that his wounds be dressed, that he be given Tylenol #3 (a controlled substance) for pain, and that he be given a daily nursing assessment and vital sign check. *Id.*

Nurse Myers did consider referring Allen off-site to an emergency department for an assessment but, upon consideration, determined such a referral was unnecessary

13

due to his stable clinical picture on exam. ECF 124-3 at 2-3. While the assault was significant and Allen clearly had signs of puncture wounds, he had no clear and obvious signs of a significant or serious abnormality that would have mandated an off-site referral. *Id.* His bleeding was controlled, his vital signs were normal, and there was no significant abnormality that made it clear he required emergent medical attention. *Id.* By admitting him to the infirmary, Nurse Myers ensured Allen would be regularly assessed by medical staff to monitor any change in his condition. *Id.* at 3. Given the existence of a puncture wound to the chest, Nurse Myers considered the possibility Allen could have a punctured lung, but the clinical picture argued against the existence of a punctured lung at that time because Allen's O2 saturation levels and lung sounds were normal. *Id.* at 3. Moreover, a small lung puncture can typically be managed through observation and will resolve on its own. *Id.* If Allen would have experienced a significant drop in O2 saturation levels or otherwise exhibited any symptoms consistent with a significant lung puncture, Nurse Myers would have sent him to the hospital immediately. *Id.* at 3-4.

On May 31, 2021, Nurse Cool evaluated Allen in the infirmary. ECF 124-4 at 1-2; ECF 124-8 at 13-15. Nurse Cool performed a detailed assessment and found Allen's vital signs were normal including his O2 saturation, temperature, and respiration rate. *Id.* Allen's pulse was slightly elevated, but still within normal limits, and he reported he was experiencing rectal bleeding. *Id.* Nurse Cool concluded from her assessment that Allen remained stable. *Id.* The rectal bleeding alone did not mandate a referral to the

14

emergency department, especially given the possibility that blood would have been ingested due to the assault. ECF 124-7 at 2.

On June 1, 2021, Dr. Marandet saw Allen in the infirmary. ECF 124-5 at 1-2; ECF 124-8 at 19-22. Dr. Marandet performed an assessment and noted Allen reported rectal bleeding but was not experiencing dizziness, abdominal pain, or hematemesis and his abdomen remained soft and non-tender. *Id.* Given Allen's reports of ongoing discomfort and report of passing blood rectally, Dr. Marandet ordered a complete blood count lab test to screen for any potential serious internal abnormalities and to monitor the degree Allen was experiencing blood loss. *Id.* Dr. Marandet also ordered that Allen receive an x-ray of his abdomen. *Id.*

On June 2, 2021, Dr. Marandet received a copy of the labs that were drawn, which revealed that Allen had a decreased hemoglobin level of 7.9. ECF 124-5 at 2; ECF 124-8 at 23-25. This decreased hemoglobin level was consistent with a patient losing blood rectally and was significantly low enough that Dr. Marandet concluded Allen should be sent to an off-site emergency department to screen for any potential serious internal injuries. *Id.* Dr. Marandet gave the order and Allen was immediately sent off-site to the emergency room for assessment. *Id.* Allen was kept at the hospital from June 2 until June 7, diagnosed with a punctured lung and rib fractures, and received a blood transfusion. ECF 124-5 at 2. On June 7, Allen returned to MCF's infirmary where he continued to receive treatment from staff, medications, and an off-site referral to an orthopedic surgeon regarding his report of shoulder discomfort. ECF 124-3 at 4.

15

The medical defendants provide an expert report from Dr. David Lemke, who opines Allen received appropriate medical care at MCF which complied with the applicable standard of care. ECF 124-7 at 2. Specifically, Dr. Lemke opines it was reasonable and appropriate to admit Allen to the infirmary for continued monitoring on May 28 given his normal vital signs and lack of any indication of a severe abnormality. ECF 124-7 at 2. Allen was properly monitored and given pain medication in the infirmary and, once his rectal bleeding progressed and his hemoglobin levels dropped, he was promptly referred to the emergency department for treatment. *Id.* at 2-3. Dr. Lemke opines that, had Allen been sent to the emergency department immediately on May 28, he likely would have received care and treatment consistent with what he received in MCF's infirmary. *Id.* at 3.

Here, it is undisputed the medical defendants treated Allen's injuries by cleaning and bandaging his wounds, providing him a Toradol injection and Tylenol #3 for pain relief, admitting him to the infirmary, monitoring his condition, performing tests once his condition worsened, and referring him to the emergency department for treatment once his labs showed decreased hemoglobin levels. To survive summary judgment, Allen must provide evidence this treatment violated a standard of care or was "plainly inappropriate."

Allen raises one argument in this regard. He argues the medical treatment he received was "plainly inappropriate" because the medical defendants should have immediately performed diagnostic testing and sent him to the emergency room on May 28 rather than admit him to the infirmary for monitoring. ECF 132-1 at 3-7. But this

amounts to a mere disagreement with medical professionals, which is insufficient to show a constitutional violation. *See Ciarpaglini*, 352 F.3d at 331 (concluding an inmate's complaint that merely disagreed with his doctor's diagnoses and treatment decisions did not state a cognizable Eighth Amendment claim). Specifically, the medical defendants provide an expert report from Dr. Lemke opining that: (1) it was appropriate and within the standard of care to admit Allen to the infirmary for continued monitoring and treatment on May 28 given his normal vital signs and lack of any indication of a severe abnormality; (2) Allen was properly monitored and given pain medication in the infirmary and referred to the emergency department for treatment once his condition worsened; and (3) had Allen been sent to the emergency room immediately on May 28, he likely would have received care and treatment consistent with what he received in MCF's infirmary. ECF 124-7 at 2-3. Allen disagrees with Dr. Lemke's assessment and argues he should have been sent immediately to the emergency room, but he does not cite to any evidence supporting this argument or showing the treatment he received violated any standard of care. Therefore, Allen's mere disagreement with the medical defendants' treatment decisions, in the absence of any evidence those decisions were "plainly inappropriate" or violated any standard of care, is insufficient to show a constitutional violation. *See Reed v. Indiana Dept. of Corrections*, 30 F. App'x 616, 618-19 (7th Cir. 2002) (concluding an inmate's argument that his physician should have provided surgery options and conducted diagnostic testing rather than perform examinations was a mere "disagreement with medical personnel" and could not show deliberate indifference "even if the treatment decisions

17

demonstrate negligence or malpractice," as there was no evidence to suggest the

treatment decisions "were anything but [the doctor's] professional medical judgment").

Allen also argues the medical defendants' decision to admit him to the infirmary on

May 28 violated IDOC's "Health Care Services Directive," but he does not explain how

this decision violated this directive and, in any event, a violation of a departmental

directive does not show a constitutional violation. ECF 132-1 at 5, ECF 132-2 at 57-61;

*Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003) ("42 U.S.C. § 1983 protects plaintiffs

from constitutional violations, not violations of state laws or . . . departmental

regulations"). Accordingly, there is no evidence in the record by which a reasonable

jury could conclude the medical defendants' decision to admit Allen to the infirmary

rather than send him to the emergency department on May 28 violated any standard of

care or was "plainly inappropriate."

Moreover, even if the medical defendants' decision to admit Allen to the

infirmary rather than send him to the emergency department on May 28 *did* violate a

standard of care, Allen has not provided any verifying medical evidence that the delay

caused his condition to worsen or had any detrimental effect. Where, as here, a plaintiff

alleges a delay in providing medical care, the plaintiff must also produce "verifying

medical evidence" that the delay had a detrimental effect. *Langston v. Peters*, 100 F.3d

1235, 1240-41 (7th Cir. 1996) (agreeing with the Eighth Circuit that "[a]n inmate who

complains that delay in medical treatment rose to a constitutional violation must place

*verifying medical evidence* in the record to establish the detrimental effect of delay in

medical treatment to succeed"). Thus, an "action will not lie unless the plaintiff

18

introduces verifying medical evidence that shows his condition worsened because of the delay." *Knight v. Wiseman*, 590 F.3d 458, 466 (7th Cir. 2009); *see also Williams v. Liefer*, 491 F.3d 710, 714-15 (7th Cir. 2007) (stating that plaintiff must "offer 'verifying medical evidence' that the delay (rather than the inmate's underlying condition) caused some degree of harm").

Here, it is undisputed that between May 28 and June 2 the medical defendants admitted Allen to the infirmary, bandaged his wounds, provided pain relief, regularly monitored his condition, and ran diagnostic tests once his condition worsened. The medical defendants provide an expert opinion from Dr. Lemke that if Allen had been sent to the emergency department immediately on May 28, he likely would have received care and treatment consistent with what he received in MCF's infirmary. ECF 124-7 at 3. Allen provides no evidence disputing this attestation aside from his own speculation that he should have been sent immediately to the emergency department. Therefore, because the record contains no "verifying medical evidence" disputing Dr. Lemke's attestation or showing that the delay in sending Allen to the emergency room had any detrimental effect on his condition, Allen's allegation that he should have been sent immediately to the emergency room on May 28 is insufficient to show a constitutional violation.

Accordingly, because (1) there is no evidence it was "plainly inappropriate" for the medical defendants to admit Allen into the infirmary for treatment and monitoring on May 28 rather than send him straight to the emergency room, and, regardless, (2) there is no verifying medical evidence that the delay had a detrimental effect on

19

Allen's condition, no reasonable jury could conclude the medical defendants' conduct violated Allen's Eighth Amendment rights. Summary judgment is thus warranted in favor of the medical defendants.[3]

*Wexford*

Lastly, Allen is proceeding against Wexford on a *Monell*[4] claim for "having a policy of encouraging its staff to deny necessary but costly medical care at the end of its contract with the IDOC, resulting in delayed emergency medical treatment for the serious physical injuries Allen sustained following an attack by another inmate[.]" ECF 9 at 9.

A private company performing a state function, such as Wexford, can be held liable to the same extent as a municipal entity under *Monell. See Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012) (*Monell* framework applies to private company providing medical care at correctional facility). Under *Monell*, a municipality may only be held liable for constitutional violations caused by the municipality through its own policy, practice, or custom. *Monell*, 436 U.S. at 694. To recover under *Monell*, a plaintiff must establish that: (1) he suffered a deprivation of a federal right (2) as a result of an

---

[3] Allen also states in his summary judgment response that Nurse Cool provided inadequate treatment because she did not refer him to mental health, as he was having a "mental health crisis" in the infirmary and he told Nurse Cool he needed to "speak to mental health." ECF 132-1 at 5. This allegation falls outside the scope of this lawsuit, as Allen was only granted leave to proceed against Nurse Cool "for deliberate indifference to his serious *physical injuries* following an attack by another inmate." ECF 9 at 8 (emphasis added). Moreover, Allen does not describe his mental health symptoms, provide any further explanation, or cite to any evidence in support of his assertion that he should have been referred to mental health (ECF 132-1 at 5), and none of the medical records Allen provides with his summary judgment response document any mental health symptoms (ECF 132-2 at 12-53). There is insufficient evidence in the record by which a reasonable jury could conclude Nurse Cool violated a standard of care by failing to refer Allen to mental health.

[4] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

express municipal policy, a widespread custom, or a deliberate act of a decision-maker with final policymaking authority for the municipality that (3) was the proximate cause of his injury. *King v. Kramer*, 763 F.3d 635, 649 (7th Cir. 2014). Thus, "a municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee." *Sallenger v. City of Springfield Ill.*, 630 F.3d 499, 504 (7th Cir. 2010).

Here, for the reasons discussed above, no reasonable jury could conclude Allen suffered "a deprivation of a federal right," as the undisputed facts show he received constitutionally adequate medical care from the medical defendants. *See King*, 763 F.3d at 649; *Sallenger*, 630 F.3d at 504. In any event, Allen has not provided any evidence the medical defendants were acting pursuant to any policy or widespread custom of Wexford's when they decided to admit him to the infirmary rather than send him to the emergency room. He argues Wexford is liable because it "failed to follow IDOC directive and Health Care Policy," and cites to IDOC's "Health Care Services Directive" in support of this argument. ECF 132-1 at 5; ECF 132-2 at 57-61. Allen seems to be arguing that Wexford should be held liable because its employees did not follow IDOC's Health Care Services Directive on this occasion when they decided not to send him to the emergency room. But even accepting as true that Wexford's employees did not follow IDOC's Health Care Services Directive on this occasion, there is no evidence the employees were acting pursuant to any policy or widespread custom of Wexford's when they made this decision, which is a necessary element to recover under *Monell*. *See King*, 763 F.3d at 649; *Walker v. Wexford*, No. 3:20-cv-1020-JD, 2024 WL 81219, at *7 (N.D. Ind. Jan. 8, 2024) (summary judgment warranted in favor of Wexford on a *Monell*

21

claim where the plaintiff provided no evidence Wexford had any policy or practice which caused his injury and instead argued only that Wexford should be held liable for the conduct of its employees). Therefore, because no reasonable jury could conclude that (1) Allen suffered a deprivation of a federal right, or (2) a policy or widespread custom of Wexford's was the proximate cause of his injury, summary judgment is warranted in favor of Wexford on this claim. *See id.*

Summary judgment is therefore warranted in favor of Wexford on this claim.

For these reasons, the court:

(1) GRANTS the medical defendants' motion for summary judgment (ECF 123) in its entirety;

(2) GRANTS the state defendants' motion for summary judgment (ECF 119) with regard to Allen's claim against Sgt. Heishman;

(3) DENIES the state defendants' motion for summary judgment (ECF 119) with regard to Allen's claims against Case Worker Price and Case Worker Carter;

(4) DISMISSES Correctional Sergeant Trevor Heishman, Nurse James Cattin, Nurse Kimberly Myers, Nurse Pamela Cool, Dr. Noe Marandet, and Wexford of Indiana from this lawsuit;

(5) NOTIFIES Allen under Fed. R. Civ. P. 56(f) that the court will enter summary judgment in favor of John Doe #4 unless he files a motion showing good cause on or before March 31, 2026; and

(6) REMINDS the parties this case is now proceeding on Allen's remaining claim against Case Worker Ryan Carter, Case Worker Steven Price, and John Doe

22

#4 in their individual capacities for compensatory and punitive damages for deliberate indifference to his safety in May 2021, resulting in attacks by other inmates on May 28, 2021, in violation of the Eighth Amendment.

SO ORDERED on March 16, 2026

/s/JON E. DEGUILIO
JUDGE
UNITED STATES DISTRICT COURT